# UNITED STATES COURT OF APPEALS
## DISTRICT OF COLUMBIA CIRCUIT

## ORAL ARGUMENT HELD ON SEPTEMBER 24, 2012

_____

### No. 11-7136
_____

### JUDITH BARNETT

### *Plaintiff-Appellant,*

### v.

### PA CONSULTING GROUP, INC.

### *Defendant-Appellee.*

_____

### Appeal From The United States District Court
### for The District of Columbia
_____

### PETITION FOR PANEL REHEARING
_____

*Elizabeth A. Lalik
Scott James Preston
LITTLER MENDELSON, P.C.
1650 Tysons Boulevard, Suite 700
McLean, Virginia  22102
Telephone:  (703) 442-8425
Facsimile:  (703) 442-8428

*Counsel for PA Consulting Group, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................ii

I.    INTRODUCTION AND SUMMARY OF ARGUMENTS ................. 1

II.   ARGUMENTS IN SUPPORT OF REHEARING ............................. 2

   A.   THE RECORD EVIDENCE DEMONSTRATES THAT GEORGE
        GAO WAS TREATED NO BETTER AND NO WORSE THAN
        JUDITH BARNETT ..................................................................... 2

        1.   The Record Evidence Establishes that Barnett
             Was Given the Same Opportunity as Gao to
             Remain at PA ................................................................. 3

        2.   The Record Evidence Establishes that George
             Gao Accepted a Reduced Salary to Remain at PA. ....... 5

   B.   THE RECORD EVIDENCE REGARDING OTHER
        TERMINATIONS DOES NOT SUPPORT THE PANEL'S
        CONCLUSION THAT A JURY COULD INFER DISCRIMINATION ....... 7

   C.   THE RECORD EVIDENCE BELIES THE CONCLUSION THAT
        THE SPREADSHEET IS PROBATIVE EVIDENCE OF AGE
        DISCRIMINATION ..................................................................... 9

III.  CONCLUSION ............................................................................. 14

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adeyemi v. District of Columbia,*
  525 F.3d 1222 (D.C. Cir. 2008) ......................................................... 8

*Aka v. Wash. Hosp. Ctr.,*
  156 F.3d 1284 (D.C. Cir. 1988) ......................................................... 4

*\*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ........................................................................ 12

*\*Brady v. Office of Sergeant at Arms,*
  520 F.3d 490 (D.C. Cir. 2008) ......................................................... 11

*Exxon Corp. v. Federal Trade Comm'n,*
  663 F.2d 120 (D.C. Cir. 1980) ......................................................... 11

*\*Phillips v. Holladay Property Servs., Inc.,*
  937 F. Supp. 32 (D.D.C. 1996), *aff'd,*
  1997 U.S. App. LEXIS 19033,
  1997 WL 411695 (D.C. Cir. Jun. 19, 1997)...................................... 8

*\*Royall v. Nat'l Ass'n of Letter Carriers,*
  548 F.3d 137 (D.C. Cir. 2008) ......................................................... 8

*Vatel v. Alliance of Auto. Mfrs.,*
  627 F.3d 1245 (D.C. Cir. 2011) ....................................................... 9

\* *Chief Authorities Relied Upon are Marked with an Asterisk*

## **RULES**

D.C. Cir. R. 35................................................................................1

Fed. R. App. P. 40 ........................................................................1

I.    **INTRODUCTION AND SUMMARY OF ARGUMENTS**

Pursuant to Fed. R. App. P. 40 and Cir. R. 35, PA Consulting Group, Inc. ("PA") respectfully submits this Petition for Rehearing of the Panel's May 7, 2013, Opinion reversing the District Court's decision granting PA summary judgment.  The Opinion recites three reasons for the Panel's decision.  With all due respect to the Court:

1)    the Panel's conclusion that PA treated Judith Barnett differently than George Gao, who the Panel concluded was otherwise similarly situated, overlooks and misapprehends critical facts that, when considered, definitively support upholding the District Court's decision;

2) the Panel's conclusion that summary judgment was improper because Barnett was selected for separation based on her lack of fit, while four other employees were let go for different reasons by a different decision maker, misapplies the well-established principles that a court must not act as a super-personnel department or compare employees who were not similarly situated in all material respects; and

3) the Panel's conclusion that the spreadsheet containing an abundance of employee data, including ages, warrants the discrediting

1

of Kelly's undisputed sworn testimony because a jury could nevertheless "infer" that PA used "age as a factor" when deciding to terminate Barnett is not supported by the record evidence and misapplies the legal standard governing summary judgment.

## II.     **ARGUMENTS IN SUPPORT OF REHEARING**

### A.     **The Record Evidence Demonstrates that George Gao was Treated No Better and No Worse than Judith Barnett.**

The Panel's Opinion turns on the finding that Gao, who the Panel finds is "similarly situated in all material respects" to Barnett, was treated more favorably than she.   The Panel first finds that "no one proposed splitting Barnett's salary or making any similar arrangements to keep her at PA."    However, that finding suggests the Panel overlooked critical facts, because the record evidence demonstrates that Barnett was, in fact, given precisely the same opportunity to remain at PA as Gao.   The Panel's second finding regarding Gao – that the record evidence is inconsistent on whether Gao accepted a reduced salary to remain at PA – is misapprehended and not supported by the actual evidence.   As explained below, these vital facts reveal that Gao was treated no better and no worse than Barnett and therefore comparing Gao to Barnett does not support reversal of the District Court's opinion.

### 1. The Record Evidence Establishes that Barnett Was Given the Same Opportunity as Gao to Remain at PA.

The Panel concludes that a reasonable jury may find discrimination based on the fact that Gao was given more opportunity than Barnett to remain at PA. That overlooks critical facts not noted in the Court's Opinion. In the week before the RIF, Patrick Kelly approached two PA practice group leaders, Ken Rubin and Andrew Hook, and encouraged them to absorb Barnett into their practice groups. (JA 314-315). After the RIF on October 17, 2003, Kelly again encouraged Rubin to take Barnett into Rubin's I&DS practice group. (JA 315). Rubin and Barnett communicated by e-mail about the opportunity, and Rubin proposed to Barnett the same deal he proposed to Gao: take a salary reduction and come to I&DS. (JA 181). Barnett, however, was not interested in remaining at PA and testified that it was <u>she</u> who never followed up with Rubin to pursue the opportunity:

> "Q: Could it be that you didn't respond to Mr. Rubin's October 21st e-mail because you decided to go establish your own consulting practice?
>
> A: Might have been." (JA 491-492).

Contrary to the Panel's Opinion, the record evidence makes clear Rubin did not "balk at the idea" and Kelly did not "drop it." (Op. at 6).

3

There is no evidence of either. To the contrary, the vital fact – not referenced in any way in the decision – is that Rubin offered Barnett the same deal he offered Gao, and results in Gao and Barnett being <u>identically</u> situated. Accordingly, the comparison which serves as the primary basis for the Panel's Opinion does not exist. Kelly made the same effort to get Barnett an <u>opportunity</u> to remain with PA in the ID&S group as he made for Gao, the only difference being that Barnett chose to open her own consulting practice and Gao chose to stay at PA.

This overlooked evidence also resolves the Panel's observation that "no one proposed splitting Barnett's salary." (Op. at 9). Barnett herself truncated the discussion by rejecting Rubin's salary reduction proposal. No one proposed splitting her salary because the discussions never got that far. Rubin asked if she would take a pay cut – just as Gao agreed to do – and she walked away without further dialogue.[1]

---

[1] Moreover, it was Barnett, not Gao, who openly acknowledged that "[T]ransport is not the group for the type of work I do." (JA 234). For the Kelly's transportation group to have offered to split Barnett's salary with Rubin, or any other practice leader under these facts, respectfully belies the evidence in the record. *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1988) ("[i]n a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in qualifications of the candidates, or that the employer simply made a judgment call.")

### 2. The Record Evidence Establishes that George Gao Accepted a Reduced Salary to Remain at PA.

Second, apparently relying on a human resources document from 2003 – before Gao changed practices – the Panel mistakenly determined there is a "clash" in the record evidence regarding the pay cut Gao took to remain at PA after the RIF.  (Op. at 9).  Respectfully, however, the document to which the Court apparently refers[2] reflects Gao's salary in 2003 and <u>not</u> his salary effective January 1, 2004, the date on which the record evidence demonstrates his transfer to the I&DS group became effective.  The only evidence on this point, which is undisputed, states that Gao "transferred into I&DS on Jan. 1, 2004 and his salary was reduced to $120,000."  (JA 326).

Thus, the record evidence is completely consistent on this point, demonstrating that Gao took the pay cut to stay at PA which Barnett declined to pursue.  Accordingly, no "clash" in the evidence supports reversal of the District Court's opinion.  As well, no reasonable jury could conclude, based on these facts, that Gao was treated more

---

[2] Based on a careful review of the Record, it appears that the Panel relied on the chart at JA 106 for its understanding; that chart reflects a date of December 31, 2003.

5

favorably than Barnett simply because he made the choice to remain at PA with a pay cut, which she rejected in favor of leaving PA to start her own consulting firm.

For these two reasons, PA respectfully submits that the Court overlooked and misapprehended the evidence as to Gao and the circumstances that resulted in his continued employment with PA. Gao and Barnett are, in fact, <u>identically</u> situated with respect their opportunity to remain at PA. The comparison the Court relies on in reversing the District Court's decision is erroneous. No reasonable jury could find discrimination on the basis that Gao was treated more favorably than Barnett, because the undisputed record evidence demonstrates that he was not.[3]

---

[3] Moreover, the Panel's conclusion that Kelly believed Gao "fit" no better than Barnett in the Transportation Group because "the September 30 chart" indicating "their respective areas of expertise – [T]rade and China" meant that neither were "likely to make meaningful contributions to the Group's focus on the aviation industry" was also misapprehended. (Op. at 8-9). "Trade" is an area of <u>expertise</u> and "China" is a <u>region</u>, and there is no evidence in the record to support the inference that Gao's "China focus" meant he was <u>not</u> "transportation focused." As the Panel notes, the evidence demonstrates that Gao, while being "China focused," was principally engaged in aviation projects. (Op. at 10). Unlike Gao, there is no dispute that Barnett was not a "Transportation consultant" but rather an "International Trade" consultant mistakenly located in the Transportation Practice Group.

**B.     The Record Evidence Regarding Other Terminations Does Not Support the Panel's Conclusion that a Jury Could Infer Discrimination.**

The Panel also concludes that a jury could infer discrimination because Barnett was the "only employee PA terminated for lack of fit." In support of its conclusion, the Panel points to 1) four other employees who were terminated on the same day as Barnett for reasons other than "fit," and 2) Kelly's mandate to "make [the group] profitable."  (Op. at 10).  But the fact that Barnett was selected for a reason different from the other four employees says nothing about discrimination, and the case law makes clear that courts should not second guess decisions a company might make about how to run its business.

First, as the Panel recognized, the decision to terminate the four employees was made by James Miller before Kelly became involved. (Op. at 10).  While Kelly accepted responsibility for their termination as the Partner in charge, it is undisputed that Miller, not Kelly, made the decision to terminate these employees.  (JA 324).  That alone prevents a fact-finder from inferring discrimination based on the comparison to Barnett, and disposes of this issue.  It is well settled that employees subject to different decision makers are <u>not</u> similarly situated in all

7

relevant aspects, as required to infer discrimination. *See Phillips v. Holladay Property Servs., Inc.*, 937 F. Supp. 32, 35 (D.D.C. 1996) (employees with different supervisors are not similarly situated), *aff'd*, 1997 U.S. App. LEXIS 19033, 1997 WL 411695 (D.C. Cir. Jun. 19, 1997); *see also Royall v. Nat'l Ass'n of Letter Carriers*, 548 F.3d 137, 145 (D.C. Cir. 2008) (allegation that other employees were treated more favorably could not establish pretext where plaintiff had not shown "all of the relevant aspects of his employment were <u>nearly identical</u>") (internal quotation marks omitted)(emphasis added).

In addition, the Panel notes that Barnett "seems to be the only employee PA terminated for lack of fit," but questioning the wisdom of an employer's decision-making is exactly what the case law cautions against. *See Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (it is well-settled that a court must not act as "a super-personnel department that reexamines an entity's business decisions"). The undisputed evidence is that Kelly selected Barnett for the RIF for no other reason than her international trade practice did not "fit" within the six core offerings that Kelly identified for the Transportation Group, and that, in his assessment, retaining her would interfere with

his goal of making the Group profitable. (JA 316-317). Here, Kelly's state of mind is what matters, not Barnett's speculation, in determining whether Kelly believed that Barnett's international trade practice "fit" and interfered with the Group's ultimate profitability goals. *See Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1248 (D.C. Cir. 2011) ("it is the perception of the decision maker that is relevant, not the self-assessment of the plaintiff")(citation omitted). In sum, the Panel's reliance on the basis for "other terminations" as compared to Barnett does not support reversal of the District Court's summary judgment ruling in favor of PA.[4]

## C. The Record Evidence Belies the Conclusion that the Spreadsheet is Probative Evidence of Age Discrimination.

With Gao not a meaningful comparator to Barnett, no reasonable jury could infer age discrimination based solely on the "View of TP Staff" document. The Panel, however, determined that the TP Staff document is "evidence that PA unlawfully considered age to be a relevant factor in deciding which Transportation Group employees to

---

[4] Thus, because Gao is not a meaningful comparator and the "other terminations" cannot be properly used to create an inference of discrimination, Barnett's gender discrimination claim fails as matter of law.

retain" and that "a jury might infer that PA's leadership included age as a factor in its personnel decisions." (Op. at 11-12). In reaching this finding, the Panel respectfully overlooks key evidence related to the TP Staff document and draws inferences that are unsupported by the record evidence.

First, there is no evidence in the record contradicting Kelly's sworn testimony that he never knew the TP Staff document existed before deciding to terminate Barnett. (JA 299-300). Despite this, the Panel found that a reasonable jury could disregard Kelly's testimony that he was not influenced by Moynihan and Tindale before making his determination to terminate Barnett. (Op. at 12). That conclusion is not supported by the record. Instead, the witnesses who testified all supported that Kelly alone made the decision to terminate Barnett:

(1)    Kelly testified that he alone made the decision to terminate Barnett. (JA 316-317);

(2)    Miller, who was deposed nearly three years after leaving PA, corroborated Kelly's sworn testimony on this point. (JA 446);

(3)    Moynihan also corroborated Kelly's and Miller's testimony that he played no part in making the decision to dismiss Barnett. (JA 342-343); and

(4)    Tindale also corroborated Kelly's and Miller's testimony that Kelly was the sole person who made the decision regarding Barnett. (JA 497-498).

Conversely, Barnett testified that she had no idea who made the decision to dismiss her from PA. (JA 498). Before she can present her case to a jury, though, she must come forward with evidence other than her own speculation that Kelly and PA are untruthful about the facts surrounding her termination. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008) (affirming decision of the district court explaining that the employee must provide <u>some proof</u> that the employer is lying to defeat summary judgment"); *Exxon Corp. v. Federal Trade Comm'n*, 663 F.2d 120, 126-27 (D.C. Cir. 1980) ("[i]t is well-settled that conclusory allegations <u>unsupported by factual data</u> will not create a triable issue of fact")(internal quotations omitted)(emphasis added).

The TP Staff spreadsheet does not provide Barnett with the proof she needs to support her suspicions because she cannot connect the legally necessary dots – in other words, connect the spreadsheet to Kelly, the sole decision maker – and therefore no reasonable inference can be drawn from the TP Staff document.   In the absence of a supportable inference, that spreadsheet is not "significantly probative" of age discrimination and does not warrant a finding that Kelly's testimony is untrustworthy.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) ("[i]f the evidence is merely colorable … or is <u>not significantly probative</u> … summary judgment is granted")(emphasis added).

There is nothing in the record that places any importance whatsoever on the TP Staff spreadsheet besides Barnett's suspicion that it was created for some discriminatory purpose.   But suspicion alone cannot defeat summary judgment, especially in this instance where Barnett's speculation is contradicted by the undisputed record evidence.   The TP Staff document was created some <u>seven months</u> before Kelly was asked to take over the Transportation Practice group. (JA 51-52, 95).   During those months, the documents reflect that about

a dozen employees were considered and/or selected for separation, but <u>never</u> Barnett. (JA 396-397, 404-407, 411-415). If the spreadsheet was created as a vehicle for age discrimination, then Barnett would have been noted in those records. Moreover, if Kelly was motivated by the spreadsheet to engage in age discrimination, it doesn't make sense that he did not select female Lynn McDevitt for separation, who was 59 and a year older than Barnett. (JA 273). But none of that, even in some small part, occurred. Instead, employees as young as 29 and 35 were let go along with Barnett (JA 261-262), thereby contradicting Barnett's speculation that the spreadsheet was used to select people for the RIF based on age.

Under these circumstances, it would not be proper to credit Barnett's unsupported suspicions to reverse the District Court's holding. Because the undisputed evidence establishes no connection between the TP Staff document and Kelly, and all of the evidence supports that the document had no age-based effect in any event, no reasonable jury could conclude that the TP Staff document had any effect on Kelly's decision to release Barnett.

13

III.  **CONCLUSION**

WHEREFORE, and for the foregoing reasons, PA respectfully petitions for a rehearing of the Panel's May 7, 2013, Opinion reversing the decision of the District Court.

Dated:  June 6, 2013.                    Respectfully submitted,

/s/ Elizabeth A. Lalik
Elizabeth A. Lalik
Scott James Preston
LITTLER MENDELSON, P.C.
1650 Tysons Boulevard, Suite 700
McLean, Virginia  22102
Telephone:  (703) 442-8425
Facsimile:  (703) 442-8428

*Counsel for PA Consulting Group, Inc.*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 6th day of June, 2013, I caused this Petition for Panel Rehearing and Addendum to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following:

Douglas B. Huron, Esq.
Richard A. Salzman, Esq.
HELLER, HURON, CHERTKOF, LERNER,
SIMON & SALZMAN
1730 M Street, NW, Suite 412
Washington, DC 20036

I further certify that on this 6th day of June, 2013, I caused the required number of bound copies of the Petition for Panel Rehearing to be hand-filed with the Clerk of the Court.

/s/ Elizabeth A. Lalik
Elizabeth A. Lalik
Scott James Preston
LITTLER MENDELSON, P.C.
1650 Tysons Boulevard
Suite 700
McLean, Virginia  22102
Telephone:  (703) 442-8425
Facsimile:  (703) 442-8428

# <u>A D D E N D U M</u>

**PANEL OPINION (May 7, 2013)**

**CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES,
AND CORPORATE DISCLOSURE STATEMENT**

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 24, 2012                Decided May 7, 2013

No. 11-7136

JUDITH BARNETT,
APPELLANT

v.

PA CONSULTING GROUP, INC.,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:04-cv-01245)

———

*Richard A. Salzman* argued the cause for appellant. With
him on the briefs was *Douglas B. Huron*.

*Elizabeth Lalik* argued the cause for appellee. With her on
the brief was *Scott J. Preston*.

Before: GRIFFITH, *Circuit Judge*, EDWARDS and
SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Judith Barnett appeals the
district court's grant of summary judgment against her claims

2

that she was fired from her work because of her age and sex. The district court credited the defense of Barnett's employer that she was let go during a restructuring of the firm only because her expertise was not a good fit with the firm's new business focus. Viewing the facts in the light most favorable to Barnett, we conclude that a reasonable jury could find her employer's defense to be pretext for discrimination, and reverse.

I

Defendant PA Consulting Group, Inc. (PA), is a management consulting firm headquartered in London, with offices in approximately thirty countries, including the United States. The firm is organized into industry-specific practice groups led by partners who supervise managing consultants, principal consultants, and support staff.

From 2000 until 2003, Barnett worked as a managing consultant in the firm's Transportation Group, which mainly advised clients in the airline industry. Unlike most of her colleagues in the Group, Barnett's book of business was not focused on airlines and airports. Instead, she worked with a range of American companies seeking to open new markets for their products in the Middle East and North Africa. Barnett's practice grew out of her prior work in government. From 1994 through 1998, she served as Deputy Assistant Secretary of Commerce for the Middle East and Africa. Upon leaving government service in 1998, Barnett joined GKMG, a small firm whose other consultants chiefly advised airlines hoping to open new routes and airports looking for additional carriers. GKMG brought Barnett on board to diversify its business and help expand its presence in the Middle East. In 1999, Barnett and her colleagues at GKMG merged with Hagler Bailly and became that firm's Transportation Group. When PA purchased

3

Hagler Bailly in the fall of 2000, the former GKMG consultants, including Barnett, became the new Washington-based Transportation Group at PA. For a few months after joining PA, Barnett sought to switch into a different practice group, because she was concerned that her expertise was out of sync with the Transportation Group's focus on the airline industry. But James Miller, the head of the Group, convinced her to stay. Miller told Barnett that she was doing great work, making lots of money for the firm, and on track for promotion.

Barnett continued to impress her bosses at PA and received favorable performance reviews. For example, her June 2003 review, written by Miller, described her overall performance as "very good!" In his deposition testimony, Miller remembered Barnett as a "tireless" consultant who "produced great work for the client." The percentage of her work billed to clients was higher than that of any other managing consultant in the Transportation Group.

Nevertheless, Barnett found herself part of a failing practice. Financial turmoil befell the aviation industry in the wake of the 9/11 terrorist attacks. Because PA's Transportation Group primarily served airlines and airports, its revenues plummeted in 2002. By early 2003, the Group was losing millions of dollars a year. PA's top management in London, led by its chief executive officer Jon Moynihan and its chief operating officer Bruce Tindale, stepped in to try to pull the Group out of its tailspin. First, they commissioned an internal audit, completed in January 2003, which confirmed that the Transportation Group had too many employees billing too few hours to clients. The audit recommended laying off those who were not covering their costs. Next, Moynihan and Tindale convened a series of meetings of PA executives to discuss how

4

best to address the Group's woes. Those meetings took place in February, April, and twice in September 2003.

Two major decisions emerged from the audit and meetings. First, effective at year's end, the Transportation Group would merge into the more successful Information Technology Infrastructure Group, which would continue to be led by PA partner Patrick Kelly. And second, not all of the members of the Transportation Group could be retained. Some would need to be fired. Firings in the Transportation Group had already begun in early 2003, when Miller terminated a managing consultant and a principal consultant who he determined were unlikely to generate significant new revenue. During the September 2003 meetings, Miller identified four more employees – two consultants and two support staff – who could be fired immediately.  The meeting participants also discussed trimming the Group's work in China, including closing its office in Beijing. Nobody suggested firing Barnett.

To carry out the reduction in force, Kelly met with Miller on September 30 to discuss each member of the Transportation Group. Kelly and Miller produced a chart that rated each of the Group's employees in three areas: "Skill and Capability," "Performance," and "Commitment to PA." Barnett received the highest possible rating, three check marks, for her "Performance" and her "Commitment to PA." According to Kelly, "Skill and Capability" was meant to reflect "how valuable [the employee's] skill set was, how relevant it was to what we're trying to sell in the marketplace" relative to the work of the Transportation Group. Barnett received two check marks in the "Skill and Capability" category, with an accompanying note: "Trade." Significantly, another of the Transportation Group's managing consultants, George Gao, who worked out of both the Washington and Beijing offices, earned similar, but less impressive, ratings: two checks for

5

"Skill and Capability" and "Performance," and three checks
for "Commitment to PA." Like Barnett, Gao received a note
next to his "Skill and Capability" rating: "China." According to
Miller, Gao's consulting practice was "very China-focused"
with minimal capabilities and experience in the aviation
industry. Gao was forty-one years old.

Immediately following the September 30 meeting, Kelly,
who was now in charge of personnel matters for the
Transportation Group, accepted Miller's recommendation to
fire the four employees he had named. Miller directed Michael
Fleming, a Transportation Group managing consultant, to draft
a memorandum describing why Miller and Kelly had chosen to
fire these employees. The memorandum, received by Miller
and Kelly on October 7, states that the Group "had to downsize
and eliminate non-core activity . . . to align more closely with
the needs of the aviation market . . . ." The Group would
henceforth emphasize six "focus propositions": (1) "Airport
privatization"; (2) "Airport air service development"; (3)
"Airport transformation"; (4) "Airline route profitability"; (5)
"Airline labor"; and (6) "Airline transformation."

On October 10, Kelly met individually with senior
members of the Transportation Group, including Barnett.
Kelly testified that "the purpose of the meeting[s] was just to
get to know people a little bit, get to know their views on what
we needed to make a success of the unit." Kelly met with
Barnett for about fifteen minutes. By October 16, Kelly had
added her to the list of those to be fired. According to Kelly, he
did so because Barnett's practice was not focused on the
aviation industry and thus fell outside the six "focus
propositions" that would govern the Group's work going
forward. An updated version of the October 7 memorandum,
dated October 16, is essentially unchanged except to include
Barnett on its list of layoffs for the first time. The October 16

6

memorandum describes Barnett's practice as a "non-core activity" and "essentially a standalone offering," and concludes that "Barnett does not have the skills necessary . . . to support our current propositions, and therefore, cannot be utilized within the practice." PA fired Barnett and the four other employees on October 17. Barnett was fifty-seven years old at the time.

Although PA closed its Beijing office in November 2003, Gao remained at PA. Kelly reached an accommodation with Ken Rubin, head of a practice group focused on international development, that Gao would split his time between Kelly's group and Rubin's. Kelly asked Rubin whether Barnett could transfer into his group, but when Rubin balked at the idea, Kelly dropped it. Kelly never proposed to Rubin the idea of splitting Barnett's work between their two groups, the accommodation reached for Gao.

Barnett filed suit against PA on April 1, 2004, alleging age and sex discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634, and the District of Columbia Human Rights Act (DCHRA), D.C. Code § 2-1402.11. Following discovery, PA moved for summary judgment, which the district court granted. *Barnett v. PA Consulting Grp., Inc.*, 818 F. Supp. 2d 159 (D.D.C. 2011). We have jurisdiction over Barnett's appeal pursuant to 28 U.S.C. § 1291.

II

We review a grant of summary judgment de novo. *See, e.g.*, *Salazar v. Wash. Metro. Area Transit Auth.*, 401 F.3d 504, 507 (D.C. Cir. 2005). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

7

material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment. Thus, we do not determine the truth of the matter, but instead decide only whether there is a genuine issue for trial." *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010) (internal quotation marks and citations omitted).

We consider Barnett's age and sex discrimination claims in the same way we analyze Title VII claims. *See Vatel v. Alliance of Auto Mfrs.*, 627 F.3d 1245, 1246 (D.C. Cir. 2011) (DCHRA); *Ford v. Mabus*, 629 F.3d 198, 201 (D.C. Cir. 2010) (ADEA). "Once an employer has offered a legitimate reason for an employee's dismissal, the question at the summary judgment stage is whether the employee has 'produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee'" on the basis of, in this case, age or sex. *Vatel*, 627 F.3d at 1246 (quoting *Brady v. Office of the Sergeant of Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)). To answer this question, we look to see if there is evidence from which a reasonable jury could find that the employer's stated reason for the firing is pretext and any other evidence that unlawful discrimination was at work. *See, e.g.*, *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) .

According to PA, Kelly fired Barnett because her consulting practice did not fit the firm's plans to narrow the work done by the Transportation Group to the six "focus propositions" set forth in the October 16 memorandum, all linked to "airports and airlines in business development." Kelly denies considering any other factor in firing Barnett. We

8

must determine whether a reasonable jury could conclude this explanation is pretext.

Of course, we are conscious that a court must not act as "a super-personnel department that reexamines an entity's business decisions[.]" *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (citation omitted). PA was entitled to restructure the Transportation Group to return it to profitability and to fire people to do so. PA was also entitled to fire Barnett if Kelly believed that her consulting practice did not "fit" within the restructured Group. But there is evidence in the record from which a reasonable jury could conclude that lack of "fit" was not why PA fired Barnett, and that unlawful discrimination was. Summary judgment is inappropriate where, as here, the most significant disputes between the parties are factual in nature. *See Pardo-Kronemann*, 601 F.3d at 604.

The most important factual dispute is why PA fired the fifty-seven year-old female, Barnett, but retained the forty-one year-old male, Gao. Different outcomes for Barnett and Gao matter because in nearly all respects material to PA's explanation, Gao was similarly situated to Barnett. The most significant differences between the two are that Gao is male and younger than Barnett. Those are differences a jury should be allowed to consider.

The record is replete with evidence that PA partners, including Kelly, believed that Gao's consulting practice did not "fit" in the Transportation Group. In the September 30 chart created by Miller and Kelly, both Barnett and Gao received two check marks out of a possible three in the "Skill and Capability" rating. Each also received an accompanying notation: "Trade" in Barnett's case, and "China" in Gao's. According to Miller, these ratings meant that Barnett and Gao

9

both had strong skills in their respective areas of expertise – trade and China – but that neither was likely to make meaningful contributions to the Group's focus on the aviation industry.

There is further evidence that could lead a jury to believe that Kelly thought Gao no longer "fit" within the Transportation Group. Miller testified that he had the "same discussion" with Kelly about Gao as he did about Barnett, and that Kelly was "pretty much of the mind that [Barnett and Gao] were going to move" out of his group. But Kelly worked out an accommodation with Rubin to split Gao's time and salary "50-50" between their practice groups. By contrast, no one proposed splitting Barnett's salary or making any similar arrangement to keep her at PA. And there is no evidence that China, Gao's niche, would be part of the Transportation Group's focus going forward. To the contrary, the decision to close the Beijing office is evidence that PA had decided to reduce the Group's China operations.

According to Miller, Kelly was "very clear that he wanted to make sure [Barnett] was out of the practice." If "fit" in the Transportation Group was the sole motivating factor in Barnett's firing, a jury could reasonably question why Kelly was not similarly adamant that Gao leave the group entirely. At the very least, the efforts Kelly took to keep Gao at PA could raise a reasonable inference that "fit" was not the sole reason Barnett lost her job, and that PA partners found a way to keep a younger male consultant at the firm whose practice did not fit neatly into its new plans.

PA makes three arguments why Gao's retention could not lead any reasonable jury to find pretext. First, PA points to Kelly's deposition testimony that Gao took a pay cut to stay. Kelly's testimony, however, clashes with record evidence, a

10

document prepared by human resources staff at the firm in
early 2003, that suggests Gao's salary remained constant.
Whether Gao suffered adverse professional consequences from
the restructuring is a classic question of fact for the jury. PA
also argues that Gao's practice was marginally more profitable
than Barnett's in 2003. But Kelly testified that profitability had
nothing to do with Barnett's termination, and there is no
evidence in the record to support PA's claim that profitability
played any role in the decision to keep Gao.

Finally, PA speculates that Kelly may have offered to split
Gao's salary with Rubin because Gao "had transportation
experience" but Barnett did not. Appellee's Br. at 57. PA cites
Gao's 2002 performance appraisal, which lists several projects
Gao worked on that appear to be related to airports and the
airline industry. But Miller, the partner who completed Gao's
2002 performance appraisal, also testified that Gao "was very
China-focused. He had capabilities in aviation but *really very,
very small, still in the learning phase*." (Emphasis added).
Besides, Barnett had similar aviation industry experience. She
had worked on a project for Khalifa Airlines, an Algerian
carrier. Of course, a jury could choose to credit PA's argument
that its partners considered Gao's aviation industry experience
to be meaningfully distinguishable from Barnett's. The issue,
however, cannot be resolved at summary judgment.

In addition to the disputed facts regarding PA's treatment
of Gao, a jury could rely upon other record evidence to
discredit the firm's explanation for firing Barnett. PA makes
much of Kelly's broad mandate to restructure the ailing
Transportation Group and "make it profitable" by limiting its
focus to the airline industry. Appellee's Br. at 2. But PA
acknowledges that the four other employees fired on October
17 were let go for other reasons. Miller had determined they
were unlikely to bring in sufficient revenues or they presented

11

redundancies. Barnett, it turns out, seems to be the only employee PA terminated for lack of fit.

Barnett's evidence rebutting PA's explanation is sufficient to warrant reversal because "a factfinder's disbelief of the reasons put forward by the defendant may support an inference of intentional discrimination." *Hamilton*, 666 F.3d at 1351 (internal quotation and citation omitted). Although "we do not routinely require plaintiffs to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment," *id.* (citation omitted), Barnett has done that here. She has introduced evidence that PA unlawfully considered age to be a relevant factor in deciding which Transportation Group employees to retain. Barnett points to a spreadsheet produced by COO Tindale's secretary in February 2003 for Tindale and CEO Moynihan in advance of the first meeting they convened about the Group. The spreadsheet includes comments from the authors of the internal audit about the productivity of each employee in the Group. The spreadsheet also reports the age of each employee, including Barnett.

Neither Moynihan nor Tindale could recall why ages were part of the spreadsheet, and PA asserts that there is no evidence of a link between the spreadsheet and Barnett's firing. Kelly testified that he did not see the spreadsheet and made the decision to fire Barnett on his own, without any prodding from Moynihan or Tindale. The district court determined the spreadsheet "irrelevant" to Barnett's discrimination claims, because "Kelly, alone, made the decision to terminate Ms. Barnett," and credited Kelly's testimony that his decision to fire Barnett was not influenced by Moynihan and Tindale. *Barnett*, 818 F. Supp. 2d at 170.

12

The district court was too quick to resolve this issue in PA's favor. A reasonable jury could find the spreadsheet to be probative of discrimination, because the jury might infer that PA's leadership included age as a factor in its personnel decisions. A jury could likewise refuse to credit Kelly's testimony that he did not consult with Moynihan and Tindale on firing decisions in October 2003, given evidence that PA's CEO and COO led meetings discussing which Transportation Group employees to fire only a few weeks before.

Of course, a reasonable jury could draw the inference that including ages in the spreadsheet was a one-off case of mistaken initiative by the secretary. But so could it reasonably infer that Moynihan and Tindale wanted ages in the spreadsheet to help PA leadership decide whom to fire and whom to keep. Barnett was entitled to all reasonable inferences in her favor to be drawn from the record evidence. *See Salazar*, 401 F.3d at 507. By resolving these fact-bound questions in PA's favor, the district court committed error.

III

For the foregoing reasons, we reverse the judgment of the district court and remand for further proceedings.

*So ordered.*

# CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES, AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 28 and Cir. R. 26.1 and 28(a)(1), PA Consulting Group, Inc. makes the following disclosures and certifications:

## A.     PARTIES AND AMICI

The following parties appeared before the District Court and are parties in this Court:

Judith Barnett, Plaintiff-Appellant

PA Consulting Group, Inc., Defendant-Appellee

There are no intervenors or *amici*.

## B.     RULINGS UNDER REVIEW

The petition concerns the Opinion issued by the U.S. Court of Appeals for the District of Columbia Circuit on May 7, 2013, reversing the October 14, 2011, decision of the District Court in Barnett v. PA Consulting Group, Inc., Civil Action No. 1:04-cv-1245-BJR, 2011 U.S. Dist. LEXIS 119585 (D.D.C. Oct. 14, 2011), granting Defendant's motion for summary judgment.

## C.    RELATED CASES

This case was not previously on review before this or any other court.  To PA Consulting Group, Inc.'s knowledge, no related case is currently pending in this Court or any other Court.

## D.    CORPORATE DISCLOSURE

Counsel for PA Consulting Group, Inc. states that PA Consulting Group, Inc. is a wholly-owned subsidiary of PA Holdings, Ltd.  No publicly-held corporation owns 10% or more stock in PA Consulting Group, Inc.  PA Consulting Group, Inc. further submits that it is engaged in management and IT consulting and technology services.

Dated:  June 6, 2013.                          Respectfully submitted,

/s/ Elizabeth A. Lalik
Elizabeth A. Lalik
Scott James Preston
LITTLER MENDELSON, P.C.
1650 Tysons Boulevard, Suite 700
McLean, Virginia  22102
Telephone:  (703) 442-8425
Facsimile:  (703) 442-8428

*Counsel for PA Consulting Group, Inc.*